## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 94-00169-CR-MOORE/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

v.

MARK LODIGENSKY,

     Defendant.

_____/

### REPORT AND RECOMMENDATION ON PETITION
### FOR REVOCATION OF SUPERVISED RELEASE

This matter is before the Court on the government's Petition for Revocation of Supervised Release ("Petition"). [D.E. 175 (Petition) at 1)].[1]  The government alleges that Defendant Mark Lodigenksy ("Defendant") violated conditions of his Supervised Release and requests that his term of Supervised Release be revoked. An evidentiary hearing was held on this matter on May 28, 2014, and June 6, 2014. Having carefully considered the government's Petition, the testimony of the witnesses and the exhibits admitted into evidence at the hearing, together with the arguments of counsel, the Court finds that Defendant did violate nine (9) conditions of Supervised Release and, accordingly, recommends that the Petition be Granted in part and that Defendant's term of Supervised Release be revoked, for the reasons set forth below.

---

[1]     The Honorable K. Michael Moore referred this matter to the undersigned Magistrate Judge. [D.E. 183].

## I.  FACTUAL FINDINGS

### A.  Procedural Background

In 1995, Defendant was convicted of interference with commerce by robbery, in violation of 18 U.S.C. § 1951(a), and for use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). [*Id.*] He was sentenced to a total of 248 months imprisonment followed by a three-year term of supervised release with conditions. [*Id.*] One of the mandatory conditions of supervised release was that he not commit another federal, state, or local crime. [*See id.* at 2].

Defendant was released from prison and began serving his term of supervised release on February 10, 2012. [*Id.* at 1]. On March 14, 2013, Defendant appeared before the Court for a Final Revocation Hearing. [*Id.*] The Court dismissed the petition and reinstated Defendant and approved him for participation in the Moral Reconation Therapy Program ("MRT"). [*Id.*]

However, on June 5, 2013, Defendant was arrested in Miami-Dade County, Florida, for two criminal offenses: Burglary of Occupied Dwelling unarmed without assault or battery and Possession of Burglary Tools with intent to use. [*Id.* at 2]. Once he was arrested, the State charged him with several more violations after discovering that he matched characteristics to a suspect that the Coral Gables Police Department ("CGPD") was looking for in connection to several burglaries in the Coral Gables area. [*See* Def's. Ex. B (Case Supplemental Report)]. Defendant pled guilty to one of those state charges in exchange for the state dropping the other charges. As a result, on June

10, 2014, his probation officer prepared a Petition alleging that Defendant violated the condition of supervised release that he not commit another crime. [D.E. 175 at 1]. The Petition alleged nine violations based upon each state charge filed against Defendant as well as a special violation that Defendant did not complete MRT. [*Id.* at 2-3].

### B.   *Facts in the Record*

#### 1.   *Violation #1*

On June 5, 2013, Coral Gables police officers responded to the area of 363 Aragon in reference to a possible burglary suspect inside an apartment complex. [Gov's. Ex. 6 (Complaint/Arrest Affidavit at 1) ("Complaint")]. Officer Salcedo saw Defendant exiting 363 Aragon Avenue and cutting through a parking lot heading south towards Miracle Mile. [*Id.*] Salcedo recognized Defendant from video surveillance of other recent condominium burglaries because of Defendant's "distinct walk." [Hrg. Tr. May 28, 2014 at 113:11]. Salcedo and two other officers detained Defendant in the north side alley way located behind the 300 block of Miracle Mile. [Gov's. Ex. 6 (Complaint at 1)].

A maintenance worker, Mr. Cruz Zuniga, saw Defendant enter 380 Giralda Avenue. [*Id.*] Once in the lobby, Defendant took the elevator to the second floor and exited to the second floor parking garage. [*Id.*] While in the garage, Defendant entered the open second floor stairwell and proceeded to the sixth floor. [*Id.*] Mr. Zuniga stated that he ran after Defendant up the stairs to make contact with him when he heard a loud noise coming from one of the locked doors in the stairwell, which leads into the

hallway of the residence. [*Id.* at 1-2]. As Mr. Zuniga approached the sixth floor, he noticed that the sixth floor door was ajar and decided to enter the sixth floor hallway. [*Id.* at 2]. Upon entering the hallway, he confronted Defendant and asked him for the reason that he was in the building to which Defendant responded that he was visiting a friend and that he entered the building through the garage. [*Id.*] Another maintenance worker on the sixth floor, Mr. Sanudo, observed that Defendant was carrying screwdrivers in his left coat pocket and that Defendant fled down the stairs towards the ground floor after the confrontation. [*Id.*] The screwdrivers were found at the bottom of the stairwell where Defendant exited the building. [Hrg. Tr. May 28, 2014 at 20:15-24].

After CGPD arrested Defendant, the State brought charges against him for nine different burglaries in the area dating back to October 2012. [D.E. 175 at 2-3]. To have the other charges dropped, Defendant agreed to plead guilty to his June 5, 2013, offense. [Gov's. Ex. 6 (State Judgment at 1)].

    2.    *Violation #2*

On April 25, 2013, Coral Gables police officers reported to 4251 Salzedo Street, Apartment #608 after the building manager discovered that the apartment had damage to the front door, and that the door appeared to have been forced open. [Gov's. Ex. 7 (Complaint/Arrest Affidavit at 1) ("Complaint")]. The officers determined that the door lock had been pried open with an entry tool causing damage to the door in excess of $1,000. [*Id.*] The subject then ransacked the master bedroom by pulling apart dresser drawers, rummaging through closets, and depriving the victim of numerous

amounts of jewelry valued at $14,610. [*Id.*] CGPD investigated a nearby pawn shop, Craig's List, and eBay, but none of those sources yielded any of the stolen property. [Def's. Ex. E (Case Supplemental Report at 1) ("Supplement")].

A security camera was discovered inside the lobby of the apartment building. [*Id.*] The footage showed a while male of unknown age walk into the lobby using a cane. [*Id.*] The subject waited to be let into the lobby area, and a few minutes later on video he was observed opening the secured front door to another white male. [*Id.*] The subjects were then observed exiting the lobby together carrying what appeared to be a small carry-on with the victim's belongings. [*Id.*]

However, the apartment manager stated that he observed the subject enter the building through the stairwell. [Def's. Ex. E (Crime Scene Short Form)]. He claimed that he found a cardboard in the door latch which helped Defendant gain access to enter and exit the building. [*Id.*]

Following the incident, CGPD issued a Be On The Lookout warning ("BOLO") for the suspect. [Def's. Ex. E (Supplement at 1)]. The BOLO specifically mentioned that the subject was possibly a short, old, light-skinned Latin male who limped to the right as he walked and wore a light-colored shirt and pants. [Def's. Ex. E (Incident/Investigation Report at 2)].

After Defendant's arrest on June 5, 2013, CGPD charged him with this offense because of his physical characteristics and similar tactics he used to break into other condominiums and apartment complexes. [Gov's. Ex. 7 (Complaint at 1)]. Furthermore, a tip from an unknown citizen identified a man named Mr. Soto as the driver for

Defendant. [Def.'s Ex. E (Supplement at 2)]. Mr. Soto voluntarily agreed to respond to CGPD and stated that he knew Defendant, that he provided transportation for Defendant on numerous occasions, and that he was sole driver of the vehicle. [*Id.*]

    *3.*    *Violation #3*

On April 4, 2013, CGPD responded to a suspected burglary at 380 Giralda Avenue, Apartment # 503 where the victim reported that her door had been pried open by an unknown tool and that she was missing jewelry. [Gov's. Ex. 16 (Incident/Investigation Report at 2)]. The suspect was seen on video surveillance pushing a four-legged walker. [D.E. 199 (Hrg. Tr. June 6, 2014 at 8:11-12)]. CGPD issued a BOLO that featured a older man holding a cane and wearing a beige hat and tan button-down shirt and stated that he was last seen on April 4. [Gov's. Ex. 24 (BOLO)]. After Defendant's arrest on June 5, 2013, CGPD charged him with this offense because the "offender's modus operandi [was] consistent with other burglary cases" in Coral Gables over the past seven months. [Gov's. Ex. 16 (Case Supplement Report)].

However, on March 27, 2013, Defendant received back surgery and was in the hospital until April 2, 2013. [Def.'s Ex. F (Surgical/Anesthesia Notes)]. Defendant was fitted with braces, could not bend or twist, and was required to use a walker at all times for two weeks. [Def.'s Ex. F (Admission/Discharge/Transfer Notes)]. Defendant's ex-wife, Anne-Marie Chase, testified that she stayed with him for three to four days after the surgery and stated that he never left his bed during that time period. [D.E. 199 (Hrg. Tr. June 6, 2014 at 61:12-18)].

4.    *Violation #4*

On March 18, 2013, CGPD responded to a suspected burglary at 4250 Salzedo Street, Apartment #505. The victim, Mr. Barba, left his apartment at 10 a.m. and when he returned around 12 p.m., he discovered that someone had pried open his front door with an unknown tool. [Gov's. Ex. 17 (Incident/Investigation Report at 2)]. Once CGPD arrived and swept the area, Mr. Barba informed them that the burglar stole two watches and two iPads. [*Id.*] The police conducted an area canvass for witnesses that yielded no results. [*Id.*]

In association with Violation #5, Mr. Barba's storage unit was broken into on March 6, 2013, and the culprit stole a suitcase possessing Mr. Barba's name and apartment number. [*Id.*] Further, the suitcase contained empty watch boxes. [*Id.*]

The victim's neighbor in Apartment #504, Mr. Pantelides, stated that he heard "weird noises and banging" in the direction of the victim's apartment between 10:30 and 10:45 a.m. [*Id.*] At approximately 11:15 a.m., Mr. Pantelides then heard a dog barking non-stop. [*Id.*]

The police used video surveillance to corroborate Mr. Pantelides' statement. [*Id.*] The footage showed that at 10:49 a.m. a white male in a white cap and short-sleeved, buttoned-down shirt followed a resident into the lobby. [Gov's. Ex. 27 (Video Surveillance)]. At 11 a.m. an older male with a cane joined the man in the white cap in the lobby, and at 11:19 a.m. the man in the white cap took the cane back down to the lobby. [*Id.*][2] At that time, he handed the cane to another accomplice who gave him a

_____

[2] The cane was used as a wedge to separate the door frames, and the rubber from the bottom of the cane left a distinct black mark and indentation in the door. [Hrg. Tr.

black rolling bag, which he took up the elevator. [*Id.*] Finally, the man in the white cap and the older man both exited the elevator and left the building with the rolling bag in tow at 11:33 a.m. [*Id.*] After investigating a pawn shop, Craig's List, and eBay, the police could not locate any of the stolen property. [Gov's. Ex. 17 (Case Supplemental Report at 1)].

5.   *Violation #5*

On March 6, 2013, CGPD responded to a suspected burglary at 4251 Salzedo Street, Apartment #505. [Gov's. Ex. 10 (Complaint/Arrest Affidavit at 1) ("Complaint")]. Mr. Barba, the victim in Violation #4, discovered that his storage unit, which was located in a secured room detached from his apartment, had suffered damage to its front door. [*Id.*] CGPD determined that the door had been pried open with an entry tool. The suspect stole property valued over $10,000. [*Id.*] After Defendant's arrest on June 5, 2013, he was positively identified through video surveillance footage at the apartment building at 4251 Salzedo Street and charged with this violation. [Gov's. Ex. 10 (Complaint at 2)].

6.   *Violation #6*

On March 4, 2013, Ms. Ritchie returned to her apartment, Penthouse #15, at 4250 Salzedo Street and discovered that her front door was open and that someone had pried open the door lock with an entry tool. [Gov's. Ex. 11 (Complaint/Arrest Affidavit at 1) ("Complaint")]. The culprit ransacked the master bedroom, rummaged through Ms. Ritchie's closets, and stole approximately $25,000 worth of jewelry. [*Id.*]

---

May 28, 2014, 93:3-9; 95:11-13].

Ms. Ritchie stated she found a single hair on the living room floor, which she placed in a plastic bag and delivered to the police. [Def's. Ex. D (Crime Scene Short Form)]. Also, she commented that she had her floors cleaned the day before the burglary so the hair was not there previously. [*Id.*] However, the hair did not provide a positive DNA match to Defendant. [*Id.*]

Later that night, Ms. Ritchie found an empty metal jewelry box in the stairwell that originally belonged in her closet. [*Id.*] After she spoke with neighbors, she was informed that the door on the side entrance to the building was accessible to everyone on the street because it was missing the magnetic strip. [*Id.*]

CGPD investigated video surveillance of the burglary. [Gov's. Ex. 28 (Video Surveillance)]. At 11:11 a.m., a man with a backwards light green cap and checkered buttoned-down shirt waited outside of the apartment complex until a resident let him inside the building. [*Id.*] He traveled up the elevator with the resident only to return four minutes later at 11:15 a.m. to let in an elderly man with a cane who was noticeably hunched over as he walked. [*Id.*] At 11:31 a.m., the man with the backwards cap exited the building, but approximately one minute later, he returned with a black rolling bag, and the elderly man let him back inside the building. [*Id.*] Finally, at 11:53 a.m., the man with the backwards cap exited the building with the rolling bag through a separate stairwell right outside the lobby. [*Id.*]

Following his arrest on June 5, 2013, Defendant was charged with this violation because the modus operandi was consistent with the other burglaries in the same area over the seven month time period in Coral Gables. [Gov's. Ex. 11 (Complaint at 1)].

7.      *Violation #7*

On February 8, 2013, CGPD responded to a suspected burglary at 322 Madeira Avenue, Apartment #501. [Gov's. Ex. 11 (Incident/Investigation Report at 2) ("Incident")]. The apartment's front door featured visible pry marks on both sides and was forced open by an entry tool. [*Id.*] The officers discovered that the master bedroom had been ransacked, and the victim, Ms. Bonggi, stated that the perpetrator had stolen over $8,300 in jewelry and clothing. [*Id.*] Ms. Bonggi also testified in her affidavit that the suspect stole her suitcase, which she identified through video surveillance because she noticed the white ribbon that she placed on her suitcase. [Gov's. Ex. 11 (Written Declaration at 2) ("Declaration")].

The officers determined that the subject waited until a resident exited the apartment building because the property requires a passcode for entry. [Gov's. Ex. 11 (Complaint/Arrest Affidavit at 1) ("Complaint")]. However, when reviewing the surveillance video in evidence, the footage showed that the suspect gained entry to the building lobby without any aid at approximately 1:16 p.m. [Gov's. Ex. 11 (Video Surveillance CD)] ("Video")].[3] The suspect wore a beige hat, a light blue button-down shirt, possessed a rolling black carry-on bag, and was visibly hunched over as he walked. [*Id.*] When he reached the lobby elevator, he pulled a thin object from his shirt which looked very similar to a screwdriver. [*Id.*] At approximately 1:29 p.m., the suspect took the elevator to the basement and then promptly reentered the elevator after appearing confused. [*Id.*] Finally, the suspect left the premises around 1:41 p.m.

---

[3] In fact, only about a minute before the suspect entered the building, another man opened the secured front door without any passcode. [Gov's. Ex. 11 (Video)].

but was noticeably in possession of two rolling carry-on bags, one of which had a distinctive white ribbon tied to it. [*Id.*]

    8.    *Violation #8*

On January 9, 2013, members of the CGPD were dispatched to 838 Salzedo St., Apartment #412 in reference to a burglary at a residence. [Def's. Ex. B (Incident/Investigation Report at 3)]. Upon arrival, the officers made contact with another officer who was already speaking with Mr. Charles Walter in reference to an attempted burglary that occurred in apartment #415 located next to the victim's apartment. [*Id.*] Mr. Walter stated that he noticed obvious damages to his door and the frame near the area of the locks, but that his door was still locked. [Gov's. Ex. 21 (Incident/Investigation Report at 2)]. Numerous indentations and pry marks were left on the door. [*Id.*] He also stated he noticed similar door damage to apartment #412. [*Id.*] The officers observed that the door to apartment #412 had been successfully pried open with some kind of tool and that there was a stain of what appeared to be blood on the elevator door frame. [Def's. Ex. B (Incident/Investigation Report at 3)].

The officers searched the apartment and noticed that several drawers had been opened and that mail addressed to Sara Costa was left on the counter. [*Id.*] The officers ran a driver's license check on Ms. Costa, which indicated that she lived at a different address in Miami. [*Id.*]

The resident of apartment #414, Ms. Margaret Mary Davis, stated that between 12 p.m. and 1 p.m. she observed a tall, white male with short gray hair, wearing a gray/blue shirt standing outside apartment #415. [*Id.*] Officers proceeded to observe

video surveillance of the premises, which covers both entrances and the garage. [Def's. Ex. B (Case Supplemental Report)]. The suspect was seen on camera trespassing onto the property. Once inside the building, he traveled up and down the elevator a few times before leaving and returning with a black rolling carry-on bag. [*Id.*] The following day, CGPD was able to make contact with Ms. Costa who stated that the subject removed numerous amounts of jewelry from the property. [*Id.*]

Furthermore, DNA evidence obtained from the elevator door determined that the presumptive blood came from a male. [Def's. Ex. B (Forensic Biology Section Laboratory Analysis Report) ("Forensic Report")]. However, the DNA sample did not match Defendant's DNA on record. [*Id.*]

9.   *Violation #9*

On October 8, 2012, Coral Gables police officers responded to a call concerning a burglary at 1805 Ponce De Leon Boulevard Apartment #733. [Gov's. Ex. 22 (Incident/Investigation Report) at 2]. The victim, Mr. Luis Cuba, advised the officers that he had left his apartment on October 6 and returned at 9:30 p.m. on October 8. [*Id.*] He stated that when he proceeded to open his front door, he found the door damaged with pry marks, unlocked, and pushed open. [*Id.*] When he entered the apartment, he noticed that two chairs had been moved, but after checking the rest of the apartment, discovered nothing missing. [*Id.*]

10.   *Violation #10*

On March 14, 2013, Defendant had a hearing for the revocation of his supervised release. [Gov's. Ex. 4 (Hrg. Tr. March 14, 2013 at 1)]. Instead of revoking Defendant's

supervised release, Judge Moore decided to make Defendant complete Moral Reconation Therapy. [*Id.* at 6:3-13]. MRT is a program designed for rehabilitation of recently released inmates to prevent recidivism. [*See* D.E. 199 (Hrg. Tr. June 6, 2014 at 70:23-71:4)]. Defendant had been attending some of these classes on a voluntary basis before Judge Moore's decision but had never completed any steps in the program. [*Id.* at 56:12-24]. After Judge Moore required Defendant to go to meetings, Defendant did not attend on May 8, 2013, because he had a doctor's appointment and on May 22, 2013, because he could not find his car keys. [Gov's. Ex. 8 (MRT Email)]. Defendant was terminated for "[f]ailing to attend and participate" in the program and was accused of missing "several" mandatory sessions because he missed two out of the four sessions that he was required to attend before his arrest. [D.E. 199 (Hrg. Tr. June 6, 2014 at 69:22; 69:4)].

## II. ANALYSIS

### A.  *Applicable Standard*

In order to revoke a defendant's supervised release, the Court must find by a preponderance of the evidence that the defendant violated a condition of supervised release. *See* 18 U.S.C. § 3583(e)(3). The reasons for revoking supervised release and the evidence the court relies upon should by either formalized in written findings or orally announced and recorded or transcribed. *See United States v. Copeland*, 20 F.3d 412, 414 (11th Cir. 1994).

**B.** *Violations of Mandatory Conditions*

The government alleges that Defendant violated the condition of his supervised release that prohibited him from committing other crimes by committing the foregoing nine violations. Throughout these nine violations, the government argues that Defendant committed the following crimes: burglary of an occupied dwelling, possession of burglary tools with intent to use, grand theft, criminal mischief, and trespass in a structure.

*1.* *Burglary of an Occupied Dwelling*

We turn first to the burglary charges. Section 810.02 of the Florida Statutes provides that a person commits burglary if he "enter[s] or remain[s] in a dwelling, a structure, or a conveyance with the intent to commit an offense therein . . . ." Fla Stat. § 810.02(1)(a). The charge is classified as burglary of the second degree if the subject:

> does not make an assault or battery and is not and does not become armed with a dangerous weapon or explosive, and the offender enters or remains in a:
>
>> (a) Dwelling, and there is another person in the dwelling at the time of the offender enters or remains;
>>
>> (b) Dwelling, and there is not another person in the dwelling at the time the offender enters or remains.

Fla. Stat. § 810.02(3).

However, charging a person with burglary based only on circumstantial evidence must "eliminate all reasonable hypotheses of innocence. Evidence that a suspect is present at the scene of a crime and flees after it has been committed is insufficient to exclude a reasonable hypothesis of innocence." *Owen v. State*, 432 So. 2d 579, 581 (Fla. 2d DCA 1983). Circumstantial evidence can include physical evidence connecting the

suspect to the burglary such as fingerprints, eyewitnesses who can place the suspect at the scene of the crime, or possession of burglary tools. *See Beckford v. State*, 964 So. 2d 793, 796 (Fla. 4th DCA 2007) (reversing conviction for burglary where the defendant was only seen on the property talking on his cell phone, did not possess any burglary tools and was not wearing gloves to prevent fingerprints). The government charges Defendant with committing burglary of an occupied dwelling in all nine of the criminal violations.

### a. Violation #1

We find that the government has met its burden and proven by a preponderance of the evidence that Defendant violated the burglary statute in Violation No. 1. First and foremost, Defendant pled guilty to this charge in state court to have the other burglary charges dropped. Therefore, he concedes that he committed the crime on June 5, 2013.

Second, even if the Defendant had not so conceded, the government only has to prove that Defendant is more likely than not guilty, and circumstantial evidence based on the facts meets that burden. When Officer Salcedo arrived on the scene after receiving a call that a possible burglar was on the premises, he noticed Defendant fleeing across a parking lot. Salcedo recognized Defendant's "distinctive walk" from several different video recordings at surrounding complexes in the Coral Gables area, which gave him probable cause to make the arrest.

Furthermore, at least two eyewitnesses could place Defendant at the scene before the police were alerted. A maintenance worker, Mr. Zuniga, saw Defendant

enter the lobby, and he followed Defendant through the garage and up the stairs to the sixth floor. When Mr. Zuniga confronted the unknown man, Defendant claimed that he was visiting a friend, and that he entered the building through the garage. However, Defendant's claim is easily refutable. First, Mr. Zuniga witnessed him enter the building through the lobby, not the garage. Second, even if Mr. Zuniga did not witness Defendant enter the building, Defendant claimed to be visiting a friend but was entirely alone, and no one had let him into the complex. Also, another maintenance worker on the sixth floor noticed Defendant carrying screwdrivers, a common burglary tool, in his left pocket and watched him flee down the stairs after Mr. Zuniga confronted him.

Combining the guilty plea in state court with the circumstantial evidence presented, we find that the government has shown, by a preponderance of the evidence, that Defendant entered the condominium complex with intent to break into one of the units and steal property in violation of Section 810.02(3)(a). Defendant's commission of burglary of an occupied dwelling is a violation of a supervised release condition, as alleged in Violation No. 1 of the Petition, and supports the revocation of his supervised release.

### b. *Violations #2 through #9*

We find that the government has met its burden and proven by a preponderance of the evidence that Defendant violated the burglary statute in Violation Nos. 2 through 9. Defendant followed the modus operandi of other burglaries in the Coral Gables area from October 2012 to June 5, 2013.

Video footage in Violation Nos. 4 and 6 both showed that an accomplice waited outside until a resident unlocked the secured front door. The accomplice then followed the resident into the building and took the elevator. Only minutes later, he returned to the lobby to let in Defendant who wore a long-sleeved buttoned-down shirt[4] and khaki or dress pants. Defendant carried a cane and walked hunched over as if he suffered from back pain. After the accomplice opened the front door for Defendant, both traveled up the elevator. The accomplice returned to the lobby with the cane and either received a black rolling bag from the driver, Mr. Soto, or exited the building to retrieve the black rolling bag himself. Both ascended up the elevator again and then returned to the lobby or exited a separate stairwell approximately fifteen minutes later with the black rolling bag. Defendant was noticeably walking without the cane but was still hunched over and leaning to the right.

After every incident, the door to the burglarized apartment was noticeably damaged from pry markings left by the cane and screwdriver. The cane bowed the door so the screwdriver could more easily jimmy the lock. Each door that had a circular, black indentation helped the police identify Defendant as the culprit because he was seen on camera bringing a cane into the burglarized complexes.

One particularly interesting sequence of events concerns Violation Nos. 4 and 5. The victim discovered that his storage unit had been broken into and that the door to the unit had pry marks from some entry tool. The culprit stole a piece of luggage that had the victim's name and address. Only twelve days after the theft, the victim's

---

[4] Defendant likely wore the long-sleeved shirts so video surveillance could not record the tattoos on his arms.

apartment was burglarized, and the door to his apartment featured the *same* pry marks that his storage unit had. Further, video evidence showed the same two suspected men from earlier burglaries in the complex at the time of the theft.

Violation No. 7 provides even stronger circumstantial evidence. The victim returned to her apartment and found that her door was open and severely damaged with pry marks on both sides. She stated that she was missing a piece of luggage that could be identified by a white ribbon tied to the handle. A man with a cane was seen on camera entering the complex with one black rolling bag, yet he exited with *two* black rolling bags, and, curiously, the second rolling bag had a distinctive white ribbon tied to it.[5] Furthermore, while he waited for the elevator, the man was noticeably hunched over, and then he pulled out a long, thin object from his shirt pocket that looked almost *exactly* like a screwdriver.[6]

Violation No. 3 possesses the most difficulty for the government to prove. The suspect used the same modus operandi that the other burglaries in the area had, but Defendant's whereabouts were in question. Defendant had back surgery on March 27, 2013, and he was released from the hospital six days later on April 2 but required to wear a back brace and use a walker at all times for the following two weeks. The burglary occurred only two days after his release. Further, Defendant's ex-wife, Ms.

---

[5] The victim later stated after reviewing the video surveillance from the lobby that the second rolling bag was her suitcase.

[6] While the video footage shows that the secured front door to the lobby was not properly working, there is no dispute that the suspect was still carrying a screwdriver-like object, and that the suspect left with two rolling bags, one of which possessed the white ribbon.

Chase, testified that she stayed with him at his house for three to four days after the surgery and that Defendant never left his bed.

However, the circumstantial evidence from the facts outweigh Ms. Chase's testimony. First, Ms. Chase is the ex-wife of Defendant, and that fact evidences possible bias that weakens her testimony. Second and most importantly, Violation No. 3 appears to be the only incident where the suspect used a walker. However, Defendant was instructed to use a walker after his back surgery for two weeks after his April 2 release. Therefore, even though Defendant was released from the hospital only two days before the burglary, his alibi backfires because he used the walker in accordance with hospital instructions while committing the crime.

Given circumstantial evidence deduced from the facts, the government has met its burden to revoke Defendant's supervised release based on the burglary charges in Violation Nos. 2 through 9.[7]

### 2.   *Possession of Burglary Tools With Intent to Use*

We turn next to the possession of burglary tools charge. A person in possession of "any tool, machine, or implement with intent to use the same, or allow the same to be used, to commit burglary or trespass shall be guilty of a felony of the third degree . . . ." Fla. Stat. § 810.06. A person's intent to use the tool for burglary "must be gleaned from the totality of the circumstances in each case." *Thomas v. State*, 531 So. 2d 708, 710 (Fla. 1988) (reasoning that a person wearing socks on his hands, carrying a

---

[7] Since Defendant's arrest, the rash of condominium burglaries in Coral Gables has stopped, and CGPD has not seen a suspect with a cane or walker. [Hrg. Tr. June 6, 2014 at 25:14-24].

screwdriver, and attempting to flee was enough evidence to satisfy the totality of the circumstances test for possession of burglary tools). The government charges Defendant with possession of burglary tools with intent to use in only the first violation.

We find that the government has met its burden and proven by a preponderance of the evidence that Defendant violated the possession of burglary tools statute. A maintenance worker who witnessed Defendant on the sixth floor saw that he was carrying screwdrivers in his left coat pocket. After his confrontation with another worker, Defendant fled down the stairwell and exited the building. When CGPD investigated the crime scene soon after Defendant's arrest, they found screwdrivers at the bottom of the stairwell.

The circumstantial evidence in this violation is too strong to overlook. Not only did a maintenance worker see Defendant with screwdrivers, but as soon as officers investigated the stairwell where Defendant fled, they indeed found screwdrivers. This evidence is consistent with other burglaries in the area because the suspect was using tools to pry open doors, and, as mentioned above in Violation No. 7, the suspect was seen on camera pulling out a tool, most likely a screwdriver, from his shirt pocket. Therefore, we find that Defendant, more likely than not, intended to use the screwdrivers as burglary tools in violation of Section 810.06. Defendant's possession of burglary tools with intent to use is a violation of a condition of his supervised release, as alleged in Violation No. 1 of the Petition, and supports the revocation of his supervised release.

3.    *Grand Theft*

We turn next to the grand theft charges. Section 812.014 of the Florida Statutes provides that a person commits theft if he:

> obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>
> > (a) Deprive the other person of a right to the property or a benefit from the property
> >
> > (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Fla Stat. § 812. 014(1). The charge is classified as grand theft of the second degree if the property stolen is valued at $20,000 or more, but less than $100,000. Fla. Stat. § 812.014(2)(b)(1). The charge is classified as grand theft of third degree if the property stolen is valued at $300 or more, but less than $20,000. Fla. Stat. § 812.014(2)(c)(1-3).

The government must provide "substantial, competent evidence" to sustain a conviction based solely on circumstantial evidence. *Rager v. State*, 587 So. 2d 1366, 1369 (Fla. 2d DCA 1991) (finding that circumstantial evidence that attached the appellant to a fraudulent escrow account was insufficient when the appellant did not create or at any time control the account). For a conviction, the government must establish a value for the stolen property at the time of the theft. *Gilbert v. State*, 817 So. 2d 980, 982 (Fla. 4th DCA 2002) (holding that an owner's testimony which gave a rough estimate on the value of the property was insufficient to prove the market value of the item). The government charges Defendant with grand theft in Violation Nos. 2, 4, 5, and 6.

### a. Violation #2

We find that the government has proven by a preponderance of the evidence that Defendant violated the theft statute in Violation No. 2. The victim returned to her apartment and discovered that the front frame of her door was forced open and the door lock was pried open. A thief had deprived the victim of large amounts of jewelry. Video surveillance showed a white man with a cane walking into the lobby, and minutes later, he opened the door for another white male. The subjects then exited the lobby together carrying a bag.

Given these facts, we find that Defendant knowingly obtained the victim's jewelry with no intent to return it. The consistent modus operandi and Defendant's back issues provide compelling circumstantial evidence that Defendant was an actor in the crime. However, the strongest evidence comes from Defendant's driver, Mr. Soto. Mr. Soto informed the police that he knew Defendant and provided transportation for Defendant to all of the condominiums that were burglarized.[8]

Although the theft of jewelry strongly suggests that the value of the property was well over $300, we are hesitant to find Defendant guilty of a higher charge. The lack of direct evidence, most importantly the jewelry itself and corroborating testimony from a person with knowledge, leads us to question whether we can determine a particular value for items stolen. The victim's hearsay testimony at the time that the police took his statement is at best a rough estimate, which means that it cannot stand

---

[8] An unknown citizen identified Mr. Soto as Defendant's driver, and Mr. Soto admitted as much while being questioned by the police. [Def's. Ex. E (Case Supplemental Report at 2)]. His admission is corroborated by video surveillance from Violation No. 4, which occurred on March 18, 2013. [Id.]

as an actual value. And even if it could, the Court would be hard-pressed to find that hearsay evidence of valuation can be reliably considered even for purposes of an evidentiary hearing. Hearsay testimony was properly admitted where the Court found it to be reliable and corroborated by the entire record (such as the video surveillance footage that the Court reviewed). The particular value of stolen items is another matter.

Therefore, we find that Defendant committed grand theft in the third degree in violation of Section 812.014(2)(c)(1), which is a violation of a condition of his supervised release. We cannot find, however, that any grand theft was of such magnitude in terms of value to recommend that Defendant is guilty of first or second degree grand theft.

### b. Violations #4 and #5

We find that the government has proven by a preponderance of the evidence that Defendant violated the theft statute in Violation Nos. 4 and 5. These violations are tied together because the victim was the same. In No. 5, the victim discovered that his storage unit was pried open with an entry tool, and that his baseball card collection, a watch, and a rolling suitcase were missing. The suitcase had the address and apartment number of the victim and contained two empty watch boxes. In No. 4, less than two weeks after No. 5, the victim's apartment was burglarized, and the front door suffered the same kind of damage as his storage unit's door. The thief stole two watches,[9] jewelry, and two iPads. In both instances, video surveillance showed that a

---

[9] The empty watch boxes that were in the stolen rolling suitcase identified the watch brands that the victim owned. When the victim's apartment was burglarized,

white male followed a resident into the lobby, and then minutes later, opened the door for an older male with a cane who was hunched over and leaning to the right. They were seen leaving with a rolling bag, and the younger male was carrying a rectangular object that looked like an iPad.

More likely than not, Defendant is responsible for these thefts. A close-up of his face on camera in Violation No. 4 coupled with the distinctive walk and the use of the same modus operandi leaves little doubt that Defendant is the elderly man with the cane. Also, Defendant's accomplice was seen carrying an iPad-like object as he left the building. Finally, the man who handed off the rolling suitcase to the younger male was Mr. Soto, which placed Defendant at the scene of the crime.

Accordingly, we find that Defendant committed grand theft, but only in the third degree under section 812.014(2)(c)(1) because this Court lacks sufficient non-hearsay evidence to determine a greater value for the jewelry or iPad stolen.

### c.  *Violation #6*

We find that the government has met its burden and proven by a preponderance of the evidence that Defendant violated the theft statute in Violation No. 6. Video surveillance in the lobby displayed an elderly, hunched-over man using a cane and an accomplice who wore a backwards light-green cap using the elevator and dragging a rolling bag. The accomplice was seen on camera exiting the building through a separate stairwell with the rolling bag only forty minutes after he first arrived at the complex. When the victim, Ms. Ritchie, returned to her apartment, she noticed that her

_____

those watches were the two that were missing. [Gov's Ex. 17 (Incident/Investigation Report at 2)].

door was open and damaged from pry marks. She found hair when she walked inside her apartment and discovered her jewelry box at the bottom of the stairwell.

Given these facts, we find that Defendant was directly involved in the theft of Ms. Ritchie's jewelry. While Defendant claims that the DNA evidence from the hair did not positively match him, the subject on camera had an accomplice so an inference can be made that the hair belonged to his accomplice. Further, the subject was hunched over, which connects the Defendant to the suspect due to his back problems. Next, the subject used a cane, which is the tool that the officers testified would leave a distinctive black mark and indentation in the door. Finally, while the footage only showed the accomplice leaving the building, circumstantial evidence provides that the two culprits were in collusion,[10] and therefore, the emptied jewelry box can be directly tied to Defendant.

We find that Defendant committed grand theft in the third degree in violation of section 812.014(2)(c)(1).  Again, because the government did not establish with any non-hearsay evidence the value of the property itself, we can only find that Defendant more likely than not stole property in excess of $300. His commission of grand theft in the third degree violates a condition of his supervised release and supports revocation of that release.

---

[10] The man with the green cap opened the secured front door to the complex for the hunched-over, elderly man. After both traveled up the elevator, 15 minutes later the man with the green cap went down to the lobby, left the building, and returned with a rolling bag. The elderly man promptly traveled down the elevator, opened the front door for the accomplice, and both went up the elevator again.

4.    *Criminal Mischief*

A person commits criminal mischief if "he or she willfully and maliciously injures or damages by any means any real or personal property belonging to another . . . ." Fla. Stat. § 806.13(1)(a). The charge is classified as a first degree misdemeanor if the property damage is greater than $200 but less than $1000. Fla Stat. § 806.13(1)(b)(2). The charge is classified as a third degree felony if the property damage is greater than $1000. Fla. Stat. § 806.13(1)(b)(3).

Malice cannot be presumed because a defendant's conduct caused property damage, but rather "one must look to the circumstances surrounding the conduct which caused the damage to determine whether the element of malice was present." *M.H. v. State*, 936 So. 2d 1, 3 (Fla. 3d DCA 2006) (finding that an appellant's act of flipping a scooter while eluding police constituted an intentional act because the appellant was purposely trying to escape). The government charges Defendant with criminal mischief in violations two through nine.

We find that the government has met its burden and proven by a preponderance of the evidence that Defendant violated the criminal mischief statute in Violation Nos. 2 through 9. Between October 2012 and April 2013, the Coral Gables condominium burglaries all featured the same characteristics. The doors of the burglarized apartments support that fact. In all the violations where Defendant is charged with criminal mischief, the doors were bowed and pried open. The culprit used a cane to open the front frame and some type of entry tool to push the lock back. The cane left a very distinct, black indentation, and the entry tool left pry marks around the lock.

From these set of facts, we find that Defendant willfully damaged the apartment doors. In every instance, once the subject pried open the door, he stole or attempted to steal personal property. Therefore, it can be inferred that the door was maliciously harmed for the purpose of stealing property inside the apartment. Further, as mentioned above, the suspect had a distinctive walk and always wore a buttoned-down shirt. Defendant was arrested because Officer Salcedo noticed his walk from video surveillance, and Defendant wore the same attire that the burglary subject wore throughout the crime spree. As a result, the government has presented sufficient evidence to establish that Defendant committed criminal mischief in violation of Sections 806.12(1)(b)(2) and 806.12(1)(b)(3), but again only as to the minimal category allowed under the statute given the lack of corroborating valuation evidence – a first degree misdemeanor.

  5. *Trespass In a Structure*

A person commits trespass in a structure if "without being authorized, licensed, or invited, willfully enters or remains in any structure . . . ." Fla. Stat. § 810.08(1). Trespass in a structure is a misdemeanor of the second degree. § 810.08(2)(a). The term "willfully . . . refers to a general intent and merely means that, as in burglary, the entry or remaining be intentionally, knowingly, and purposely done." *Rozier v. State*, 402 So. 2d 539, 543 (Fla. 5th DCA 1981) (holding that the word "willfully" is a general intent term and is not a separate essential element of trespass so as to require different specific allegations than the usual allegation of burglary). The government charges Defendant with trespass in a structure in Violation Nos. 3, 7, 8, and 9.

We find that the government met its burden and proven by the preponderance of the evidence that Defendant violated the trespass statute. Because we have already found that Defendant committed burglary, we can find that Defendant committed trespass as well. Burglary requires "entering or remaining in a dwelling," which is trespass if an individual is not "authorized, licensed, or invited" to be at that location. § 810.02(1)(a); § 810.08(1). Either Defendant or his accomplice entered the condominiums by following a resident who could unlock the secured front door. This fact confirms that Defendant willfully entered the buildings without permission from any of the residents.

### C.    *Violation of Special Condition*

The government alleges that Defendant violated the condition of his supervised release requiring him to complete the Moral Reconation Therapy Program. We find, however, that the government did not meet its burden with respect to this violation.

First, the government contends that Defendant missed several classes, which resulted in his eventual termination from the program. However, this assessment is not entirely accurate. The government is including classes that he missed when he was voluntarily attending the program. A voluntary commitment has no association with a violation of conditional release, and thus, those classes should be not counted against Defendant. The only classes that matter in this Court are those classes he was supposed to attend after Judge Moore required him to participate in the program.

Second, the government argues that Defendant missed half his required classes after Judge Moore issued his decision. While that is true, there were only four possible

classes that Defendant could attend. Missing two classes, while not negligible, is certainly not substantial enough to mandate a violation of his supervised release. We find that the government provided insufficient evidence to support a violation, and therefore, Violation No. 10 may not be the basis of revoking Defendant's supervised release.

### III.  CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge hereby **RECOMMENDS** that the government's Petition for Revocation of Supervised Release [D.E. 175] be **GRANTED** in part and that Defendant Mark Lodigensky's Term of Supervised Release be **REVOKED** based on the undersigned's finding that the government proved Violation Nos. 1 through 9 in the Petition as set forth above.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable K. Michael Moore, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982)(en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 3rd day of July, 2014.

_/s/   Edwin G. Torres_
EDWIN G. TORRES
United States Magistrate Judge